Here's the next case on the calendar, Bugliotti v. Republic of Argentina. Good morning, Your Honors. My name is Michael Spencer. I'm representing the plaintiff appellants. I may refer to them by the name of Mr. Bugliotti. I've reserved three minutes for rebuttal. I believe that all of Your Honors have been on Argentina bond panels before. There's probably nobody on the Court who hasn't, except maybe the new members. Except for those lucky folks who are recused. In any event, Your Honors, this is not, as far as I can tell, a continuation of any line of cases involving the bonds. This is essentially a one-off case involving the tax credit program in Argentina, which I don't think has been litigated up here before. On the other hand, the underlying complaint here is a very standard, plain vanilla complaint seeking to recover on the defaulted bonds, similar to the hundreds of complaints that Judge Preska have adjudicated over the years. The monkey wrench for the plaintiffs in this, of course, is that the plaintiffs entered their bonds, and there's no dispute that they did purchase and own the bonds at the beginning of this story. They entered the bonds into the tax credit program, which was set up in with respect to a private trust agreement between the participants in the program, including Bugliotti, and Caja de Valores, which is a private institution which does a huge amount of business for the Argentine government. And those two documents, the decree and the trust agreement, were coordinated so that they would be consistent with one another. So, Argentina here said that by doing that, Bugliotti had, by putting the bonds into trust, that Bugliotti had relinquished all interest in the ownership of the bonds, similar to a bondholder who had just sold the bonds in the market and got them- Well, or who had exchanged them for other securities, is really their argument. Or exchanged them for other securities, yes. And as you know, exchanges have a history in the Argentina bond cases, but this is not that kind of exchange. Well, it's not that kind of exchange. The very issue is, is it some kind of exchange of one security for another, or is it something else? Right. Is it an exchange in the sense that the first security, the bonds, disappeared as far as the Bugliottis were concerned, or not? And I submit, Your Honors, and certainly we argued this to Judge Prescott as well, that virtually everything in the documents, and also in what Argentina has submitted below and to this Court, indicate that Bugliotti retained ownership interests, sometimes called beneficial interests, sometimes called residual beneficial or beneficiary interests, in the bonds. I can certainly see a model that one might say is analogous, that under the laws of New York would constitute retaining an interest, right? If you had, in some situation, conveyed a title to a security to a trustee who had restrictions on what the trustee could do, and you were the beneficiary of the trust and retained various kinds of interests, you would say there still is at least some kind of legal interest in the security, what it would be and how it would play out, I guess, which could be interesting depending on the terms of the trust. But do you agree that whatever this is and how it should be characterized has to be determined by Argentine law rather than the law of New York? I do believe that the relationships between the parties to the trust agreement and the program are to be determined under Argentine law. I don't think that that disqualifies either the district court or this court. From deciding the case under Argentine law and looking to Argentine law to decide what this trust arrangement means. Yes. And do we know enough, in other words, in the record, in terms of Argentine law, we've got, of course, the declarations of Frias, is, is there enough in the record that, and beyond the attorney general's declaration and some of the other materials, is there enough in the record about Argentine law that allows us at this juncture to resolve that question? Or should we simply, do we need to remand for a further exploration of Argentine law? I don't think you do for several reasons. One is the underlying documents pretty much speak for themselves. And those documents both. But isn't there a conflict between some of those documents and, and the, and the Frias declaration? I don't think so, Your Honor. Well, what, what are we to make of the fact that the document that creates this program refers to the, what do they call the, the CCs as government securities? I mean, that, that seems peculiar because I would have thought that in the American law analogy that I'm trying to work through in my head, you wouldn't say if you gave, conveyed a bond to a trustee to administer while retaining the beneficial right to the proceeds of the, the bond. You wouldn't say that whatever account statement or receipt that you got from the trust company or the brokerage firm or whoever was the trustee constituted some kind of security. It would be quite clear that the only security involved was the original bond. But when you have a legal document that creates this program that says that the thing that you get when you turn over your security, which clearly before you turn it over is a security, to a trustee is another security. Under what, under which of those two securities does the original bondholder retain a right to be paid? Well, I think you have to look at that in context. And when you look at what the CCs are, which as you said, there's a couple of ledger pages and the records, accounting records of CAA and, and nothing else. The question then has to be, is that reference in, in the midst of all of the other descriptions of these things in the program documents sufficient to persuade this Court or Judge Preska that is the CCs. I guess it was sufficient to persuade Judge Preska. Maybe it shouldn't have, but, but, but I mean, the, the thing that I'm, I'm grappling with here is, isn't the, isn't your client taking the position in Argentina precisely that he is entitled to be paid under the CCs? No. No. I, I. He never took that position? He, he took the position that it was unconstitutional for Argentina to enact laws that prohibited him from recovering. He, he did say that he was entitled to recover, whether it was under the CCs or because the CCs represented the bonds, I think is, is not particularly clear in his Amparo papers. But to me, the bottom line of that is Argentina has said that both the CCs and Mr. Bugliotti's description of the CCs in the Amparo proceeding establishes that it's the CCs that are the payment mechanisms here, not the bonds. Well, isn't that a pretty good indication? Isn't that a better indication of what Argentine law is than our best guess or what the interested party, the attorney general has to say, or what your expert has to say? Well, we didn't have an expert. We didn't know the trust law was going to be introduced. Well, but I mean, if a court has said that the basis of payment here is appropriately the CCs, and it gave him some payment, did it not under this? Not, not for principle, never. Not, I thought that there was some order of the court that some percentage, he was entitled to some percentage payment. In the Amparo proceedings, the court ordered security for costs and, and defined it as 25% of some amount. Either way, I assume that's a provisional remedy. That's not a, something that's collaterally, it stops anybody. I wouldn't. I, I'm sure that's correct. And it didn't represent a recovery of principle. I see. But, but, but isn't it based, but the court's order to even require that security was based on a conclusion, at least in part, that he was, had a reasonable argument that he was entitled to be paid under the CCs, not under the underlying bonds. If you look at the Amparo complaint, which is excerpted by Argentina in the record, there's nothing there that looks like a request for payment of a money judgment. It was not a proceeding to recover money. It was analogous to a proceeding to declare the lock laws unconstitutional. And in the course of that, in rather florid language, I agree, Julio's lawyers described the fact that there, there was a lot of money involved here and he needed to be able to recover the principle on the bonds, but whether, whether he committed to, well, whether or not he committed is of less interest to me because I, I think it's, I don't see anyone making an argument of judicial estoppel or something like that, but it's less of less interest to me than what the court had to say about the subject. And if they're giving security for costs, did they say anything in your view that indicated that they were giving security because maybe the outcome of this proceeding would entitle him to money under the bonds or because maybe the outcome of this proceeding would entitle him to be paid under the CCs? It didn't get that far. I see. Never, never came anywhere close to that. And it was focused on the constitutionality of the lock laws and moratorium laws, not on trying to recover the principle and the unpaid post maturity interest on the bonds that we are seeking here. There's a provision, as you know, of the trust agreement, which says, and I'm quoting in no case shall the trustee be in charge of pursuing the enforcement of the rights that are granted by the trust assets, namely the, that is the bonds. Isn't it possible to read it as relieving the trustee of an obligation to enforce the bonds, but without reserving the power without reserving to your clients, the power to do so. In other words, the trustee would have the power to enforce the bonds, but also the freedom not to. Well, I believe that that's correct. I, I hope that you understand that it was exactly the provision that you're talking about that led CAHA to provide ratification for the plaintiffs here to actually bring this lawsuit. So it was clearly CAHA's view that a, an action to recover the bond principle and unpaid post maturity interest was appropriate because they ratified Bugliotti's institution of this action. Well, at least that they didn't think that they had any right obligation or interest in preventing him from doing so. Right. But it was more than that. When you look at the document between Bugliotti and CAHA, where, where CAHA and Bugliotti certified to each other what was going on there, it doesn't just say that CAHA doesn't need to sue. It says that Bugliotti wants to sue, that CAHA in view of the fact that it's not obligated under the agreements to sue is going to look to Bugliotti to do it. And in fact, they even got an indemnification from Bugliotti against any, any liability that CAHA might incur as a result of that. So I believe that that certification is. Argentina disputes whether there was, whether there was any such ratification. Well, whether there was such ratification is stands or falls based on the document I'm discussing. And I'm, I'm confident that if you look at it and interpret it in a reasonable fashion, it's not what Argentina says it is, which is simply CAHA's statement that it doesn't want to bring suit or doesn't have to bring suit. It's a fairly full discussion saying CAHA's not bringing suit. Therefore, the plaintiffs can bring suit. The plaintiffs are not going to seek pre-maturity interest. The plaintiffs are going to indemnify us. If that's not a ratification by CAHA of, of the action that it did not want to and was not obligated to bring, but looked to the Bugliottis to do so themselves. I don't know how much clearer it should be, although I, I agree that Argentina does dispute that. And just, just so that I'm clear on exactly what happened here, the under this program, in effect, your client was paid interest all along. The interest was credited against his taxes and whatever the terms were of those credits may be an issue, but you're not seeking anything to do with unpaid interest. The problem only arises when it's time to recover the principle. You're, you're right that we have very specifically not sought interest that was recompensed under the program. The only footnote to that is of course, when principle remains unpaid after the maturity of the bonds, the bondholder is entitled to interest post post-maturity. Right. And that was mitigated up and down to the New York court of appeals in these cases with that conclusion. But, but we are not seeking the pre-maturity interest because of that. My time has long expired. I would be happy to go on, but I think I'll appeal to Mr. Moti. You'll have three minutes in rebuttal. May it please the court. Rahul Mukhi from Cleary, Gottlieb, Steen and Hamilton. I represent the Republic of Argentina, the appellee. I want to start where the district court began, which is before you get to any issues of Argentine law, there are three undisputed issues here that are case dispositive. First, the plaintiffs tendered their bonds to the track, to the tax trust and received new instruments, which is very plain war securities as a matter of Argentine law, the CCs and CCFs. Second, pursuant to the terms of the trust and the original decree, the bonds are quote, unavailable to the participants while they're held in trust. And thirdly, as Judge Lynch, you just pointed out, plaintiffs use their CCFs meaning to receive tax benefits over the years. Meaning the bonds have now been decoupled from the plaintiff's instruments. And if you look at Judge Prescott's decision, she relies on these three undisputed facts or undisputed issues from the plain terms of the documents in the record and said, based on those facts, plaintiffs no longer own the bonds and certainly cannot bring a suit on that. Well, whether or not, even if the plaintiffs were entitled to a judgment in their own name, why isn't the question really whether they nevertheless have the right to sue to recover the unpaid prison? Well, Your Honor, and this turns me to the Amparo petition that's pending in Argentina, because in Argentina, the plaintiffs did seek, we submit, it's clear from the record, payment on the CCs and specifically alleged the bonds are unavailable to us and so we're going to sue under the CCs and the law that applied to the bonds did not apply to them. And in the record, you can see the plaintiffs pleaded this in their petition. They said the CCs represent principal amount, which payment would take place on the original maturity date as their bond, that's at A139 to 140. They then added further, they described the CCs as public debt loans, which of course represent a payment obligation of a principal amount and a maturity date. And Judge Lynch, to your question, we think it's very clear that the Argentine courts did recognize that the plaintiffs were seeking a payment on the CCs themselves. If you look to, and this is at A236 and A237 of the record, this is the Argentine Court of Appeals decision on A236 before resolving the interim measure. The Argentine court observes that the plaintiff is the holder of the CCs. And then when ruling on whether the showing under the merits had been made by these plaintiffs, the court observes that the case at issue involves collecting the principal of the instruments the plaintiffs own. So it's clear from the Argentine court decision that that's what's going on. And if you look at Bugliotti's prayer for interim relief, he's seeking an order regarding the right to enforce payment. And Judge Lynch, you're correct. He seeks 30% of the principal amount of the CCs. And in fact, he received interim relief based on that pleading. To the extent that the district court relied on Argentine law, is there anything beyond the Attorney General's declaration that was relied upon in terms of interpreting Argentine law? Well, Your Honor, I agree with my adversary on one point, which the Attorney General's declaration is completely consistent with the plain face of the documents that... Could you answer my question? Yes. My answer to your question is yes. The plaintiffs, in opposition to our motion to dismiss, submitted a declaration from Mr. Leendo. This is at A254, who's an Argentine lawyer. He's a plaintiff's Argentine lawyer. And if you look at the declaration that the plaintiff submitted, which Mr. Frias replies to, it addresses two issues. This is plaintiff's declaration. One, what's the meaning of the trust and how does the trust operate? And two, what happened in the Imparo proceeding? And those are precisely the two issues that the Attorney General replied to. And so there was, I don't even think you need to get to Argentine laws, as was argued because of the undisputed facts aside from Argentine law, but there was plenty in the record for the district court to rule as it did, to say Argentine law supported the decision based on the three undisputed facts it started with. And I'm puzzled what you mean by it's not necessary to rely on Argentine law. The plain meaning of the documents and all of that, those are all issues of Argentine law. The Argentine government issued these securities in connection with a program that was authorized by a law. So everything you're relying on is a matter of Argentine law, isn't it? That's correct. You're distinguishing maybe that from Argentine trust law? Is that? That's more accurate, Your Honor, because the decrees and the resolutions are obviously matters of Argentine law. Well, and as to that, the ruling of the court is a document of, it would seem to me, high significance about who owns what under Argentine law. And you just cited on page A236, something saying the plaintiff is the holder of custody certificates, the original instrument of which is subject to this legal regime. Then there was a default and certain payments were deferred on that, those instruments, those instruments have now matured and so on. I mean, that seems to be talking about the CCs. That's correct, Your Honor. I agree with Your Honor that the issue in the Frias declaration that plaintiffs were discussing and Judge Katzmann asked me about has to do with the Argentine trust law discussed by the Attorney General, which was in reply to the discussion by Mr. Liendo about what plaintiff's lawyer believed the trust documents. And just, just help me out a little bit with the decoupling argument, is the argument that you're making that originally the plaintiff as a holder of the bonds was entitled to payments of interest and principal under the bond. Correct. Were there coupons that were separate coupons for the interest? Because I'm wondering when, when you, when you're decoupling, your decoupling argument is, is the argument that once the CCs and the CCFs are substituted in some sense, there are now two separate, the interest is separated from the principal and represented by different instruments. Is that a change from what was true under the, or is your decoupling argument not the decoupling of the interest payments from the, the, the documents entitling the party to interest payments from the document requiring repayment of the principal, but rather is a decoupling just of the right to payment from the original bond? What do you mean by decoupling? It's the decoupling of the economic rights. So whether or not there was originally a coupon when the CCs and CCFs were originally issued, the, the interest remaining and the principal remaining matched what was originally under the bond. Once the plaintiff started using the CCFs and in fact, use them all up, there's no more of a linkage between the original economic rights represented as a whole by the bond and the CCs and CCFs. That's sort of what I thought. And then, you know, in effect what you're saying, but is there anything in the record about this is that had there not been a default, had there not been the laws deferring payment, what instrument would have to be presented in order to get payment on the principal, the bond or the CCs? The CCs. And that, that is now the, the operative instrument that the plaintiffs hold. The only circumstance, and this is in the Freya's declaration in response to Leando, is if the plaintiffs had still had both the CCs and the CCFs and they had a one-time right to terminate the trust and receive the bond back. But that terminates as soon as they use the first CCF. Is that your position? Well, so that, that is how the trust agreement reads. It's also in the, in the record that later on in 2005 and 2012, there were similarly situated CC holders who had used up some of their CCFs or all of them. There was a procedure then where either the CC holders obtained new CCFs and came to their trust and received bond, or they tendered the value that they had recognized under the CCFs and presented that with the CCs and received the bond back. But that has not occurred here. And so the trust has not been terminated and the bonds are still in trust. Can I ask you just a follow-up to my earlier question about the reliance on the Attorney General's declaration? And given that Argentina is a party to the litigation, doesn't that suggest that even though there should be respectful consideration, I think the term is, that we should be cautious in how we, as a court, rely on it? There's a language in Animal Science Product of the Supreme Court's decision in 2018, which says that when a foreign government offers an account in the context of litigation, there may be cause for caution in evaluating the foreign government's submission. Yes, Your Honor. And we recognize that language, as Your Honor pointed out. There is some due respect given, but that is the situation here. But the district court recognized that and quoted the language Your Honor did, and understanding that to be the standard, weighed the FRIAS declaration, the weight that was appropriate. And so we believe in... It seems, reading the decision, that beyond the FRIAS, there's no engagement with anything else in terms of Argentine law. Well, Your Honor, the district court had, obviously, all the papers before it, including the Liendo declaration. And just stepping back as far as, you know, plaintiffs raised the 44.1 argument. Plaintiffs were the ones who originally raised Argentine law in their complaint, given the status of CC holders. The Republic raised the fact that the entire regime was governed by Argentine law, which is obviously plain from the documents. And in the Republic's motion to dismiss, it was raised. And in the plaintiff's opposition, Argentine law was raised again in the argument, as well as in the declaration I've been referencing. There was also the Argentine code, trust code itself, an excerpt of that was submitted, as well as the resolutions and the decrees that are in the record. So there was a full record with respect to that before the district court. Thank you. I see my time is up. So unless the court has any questions, we'd rest on our arguments and papers. Thank you. Thank you, Your Honor. I'd like to suggest, Your Honors, that the trust termination provisions, both in the trust agreement and in the relevant presidential decree, are inconsistent with the idea that all of the rights in the bonds migrated to the CCs and the CCFs. And the reason for that is that it's very clear from the plain language of the agreement and the decree that under certain circumstances, the trusts would be terminated and the bonds would be returned to Guglielti. So with respect to the trust agreement, Article 11, page 862 of the record, it says termination of the trust. The trust may be terminated. C is for one time only through a unilateral decision of the trustor, Guglielti, which must be expressly notified by the signature, blah, blah, blah. The trust will be terminated. And the parallel provision in the decree, which is Article 5 on page 829, says depositors shall be able to withdraw at any time but only once the public debt securities, those are the bonds, not the CCs or the CCFs, they have deposited at Caja de Velores. So what that means and when this was set up, the CCs and the CCFs were present from the outset. So everyone knew that they were there and it would make no sense to have these termination provisions in both the decree and the trust agreement, which provide for return of the bonds to Guglielti if in fact all of the rights had migrated to the CCFs and the CCs. It's just plain logically inconsistent under Argentine law or U.S. law or any other law. I'm suggesting that what this indicates strongly, oh, and Argentina's position that those termination provisions could operate only prior to the first use of any CCF does not appear anywhere in these documents and would be ridiculous because the first CCF was used within a couple of months of when this whole program started. That was the whole point. So it just makes no practical sense to interpret these provisions that I've just read to you in any way other than the bonds remained in trust at Caja. After the CCF process was done, in other words, throughout the maturity years of the bonds, what was left was an obligation of Argentina to repay principle and an obligation to pay interest on that principle, which incidentally is not reflected in any of the tax credit program documents. So are they saying that Mr. Guglielti at the start, by signing these documents, gave up the right to get that? It is much more inherently reasonable to interpret these documents in context to provide that, particularly once all the CCFs were used up, which is another condition of termination in Article 11 of the Trust Agreement, due to the termination of the credit balances of CCFs or CCs in the respective subaccount. The way the program was supposed to work in the circumstances when all the CCFs were used up is then the repayment of principle and the attendant payment of any accruing post-maturity interest Where's the Article 11 to which you referred? Sorry? You referred to Article 11 just a moment ago and I... Oh, all right. Yeah, I've got it. Thank you. And I submit that these provisions are describing what actually happened in this case and it is clear that when that happens, the bonds are... the trust terminates. The bonds have to go somewhere. CAHA doesn't have any interest economically in the bonds. They should go back, whether physically or in their book entry form, to the only person who is entitled to recover the principle that they paid for the bonds, the Bugliotti plaintiffs here, and these documents confirm that that obligation arises under the bonds on an ongoing basis because the decree uses the term, as I mentioned, the public debt securities. Could you conclude your argument, please? On this point, I'm done. Thank you. Thank you. Thank you both for your arguments in this complicated case. The Court will reserve decision. Thank you.